## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 47041

THE CHRISTOPHER W. JAMES TRUST, UTD
February 7, 1979, CHRISTOPHER W. JAMES,
Trustee,

    Plaintiff-Respondent,

v.

HELMUT ROBERT "BOB" TACKE,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

**Boise May 2020 Term**

**Opinion filed: July 1, 2020**

**Melanie Gagnepain, Clerk**

---

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Lemhi County. Joel E. Tingey, District Judge.

The judgment of the district court is <u>vacated and remanded for further proceedings</u>.

Steven Paul Wieland, Mooney Wieland, PLLC, Boise, for Appellant.

Bryan D. Smith, Smith, Driscoll & Associates, PLLC, Idaho Falls, for Respondent.

---

HORTON, Justice Pro Tem.

This appeal arises from a contractual dispute between the Christopher W. James Trust ("the Trust") and Idaho Mineral Springs, LLC ("Idaho Mineral Springs"), a water bottling company owned by Helmut Robert Tacke ("Tacke"). Tacke appeals from the district court's judgment in favor of the Trust for $653,793.40. For the following reasons, we vacate the judgment and remand for further proceedings.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

Tacke owned and operated Idaho Mineral Springs, LLC, a Nevada corporation, which bottled spring water for sale. Tacke is a German immigrant with no formal postsecondary education. Although Tacke can converse in English, he primarily speaks German and Dutch. In 2000, Tacke built Idaho Mineral Springs' bottling facility on approximately 10 acres of a 374

1

acre parcel he owned in Lemhi County. He installed a high-density polyester pipeline running about eight-tenths of a mile from a spring on the property to the water-bottling plant. However, from 2000 to 2013, Tacke sold little to no bottled water. By March 2013, Tacke owed approximately $756,000 on two promissory notes secured by mortgages on the property and still was not selling water. That same year, Tacke's machinery malfunctioned and he needed to obtain new equipment.

At this time, Tacke began negotiating an agreement with Christopher W. James ("James"). James and his wife, Debra James, are trustees of the Trust and the Firstfruits Foundation ("Firstfruits"), a 501(c)(3) nonprofit Christian foundation. After several draft agreements were exchanged during negotiations, on March 14, 2013, Tacke, the Trust, and Firstfruits entered into a contract ("the Agreement"). The Agreement called for Firstfruits to pay off the outstanding loans on the property. In exchange, Tacke transferred title to 364 acres of the property, retaining the 10 acres of land where Idaho Mineral Springs' operations were conducted. The Agreement further provided that the Trust would loan Idaho Mineral Springs $500,000 for two years with a 5% interest rate. Because James expected that the U.S. dollar would depreciate against the Australian dollar and precious metals, the Agreement called for the loan to be repaid in specified quantities of gold, silver and Australian dollars ("the commodity basket"). The Agreement also called for quarterly interest payments of 1.25% based upon the value of the commodity basket.

Specifically, the Agreement provided:

Firstfruits will pay off the first and second mortgages no later than March 15, 2013.

Bob Tacke will transfer to Firstfruits title to the 364 of the 374 acres; he will retain title to the [Idaho Mineral Springs] Site. The title transfer will take place as soon as reasonably possible, but no later than May 11, 2013.

The Trust will lend U.S.$500,000.00 to [Idaho Mineral Springs] for two years, at 5% interest (the "Loan"). [Idaho Mineral Springs] will repay the Loan in a combination of gold, silver and Australian Dollars ("AUD"), one third each. U.S.$166,666.00 converts into 105.485 ounces of gold at today's rate of U.S.$1580/oz. U.S.$166,666.00 converts into 5,847.93 ounces of silver at U.S.$28.5/oz. of silver and U.S.$166,667.00 converts into 161,500 AUD with the $1.032 USD = $1.000 AUD.

The Trust will transfer the U.S.$500,000 to [Idaho Mineral Springs] no later than March 15, 2013, to be secured by 80% of the ownership of [Idaho Mineral Springs].

2

[Idaho Mineral Springs] will pay 1.25% interest at the end of each three month period measured from March 15, 2013. Interest will be paid on the combined value of the gold, the silver, and the AUD. If [Idaho Mineral Springs] does not repay the Loan no later than March 15, 2015, then the Loan will remain standing as a debt, and [Idaho Mineral Springs] will transfer to the Trust 20% of ownership in [Idaho Mineral Springs] on March 15, 2015 and 20% ownership on March 15, 2017. As of March 15, 2017, the Trust will own 40% of [Idaho Mineral Springs]. The Trust's ownership will remain at 40% until March 15, 2023 or [Tacke's] passing (whichever comes first), at which time [Idaho Mineral Springs] will transfer an additional 40% to the Trust.

If [Idaho Mineral Springs] pays the Loan off in full by March 15, 2015, the Trust will not have any ownership in [Idaho Mineral Springs].

Soon after purchasing Tacke's land, Firstfruits entered into a joint venture with the Youth Employment Program to develop the property and open recreational hot springs. Steve Adams is the executive director of the Youth Employment Program, a 501(c)(3) nonprofit organization. Adams described the Youth Employment Program as a "subcontractor" and "agent" of Firstfruits in managing the property. However, Adams was not permitted to act independently of James or the Trust as all property changes and development had to be approved by James.

A conflict arose between the parties over Tacke's waterline. In deposition testimony, Adams explained that he inspected the system Tacke had installed and advised James that a new water system was needed. Adams testified:

The workmanship and the quality of that distribution system that [Tacke] had was poor at best. It was open to air. It had rattlesnakes all over it. It had mice. It had everything. It was unsanitary. It was fed off of a transmission line that was leaking and didn't have a way to shut it off because the main valve that he had put in was actually an irrigation valve, not a potable water valve. And it was bent and we couldn't turn the system off. So functionally, it was a very nonfunctional system.

Adams removed Tacke's mainline and replaced it with a new PVC system. Adams reduced the flow to Idaho Mineral Springs from 91 gallons per minute—a discharge rate that Adams believed "could collapse the mainline"—to 30 gallons per minute.

Tacke claims that the new water system prohibited a direct flow of water from the spring to his plant and operated at a dramatically lower pressure than Tacke needed for Idaho Mineral Springs' operations. Tacke also claims that the water quality decreased with the new system because sediment, air, and stagnant water could be in the pipes. Emails between Adams and James discussed on-and-off cooperation between Tacke and Adams as to when and how to meet

Tacke's needs. Nevertheless, Tacke contends that from 2014 onward, he could not accept orders for bottled water because he had no water due to Adams' actions.

The Agreement's deadlines came and went, and Idaho Mineral Springs made no payment on the loan. Tacke did not transfer any interest in Idaho Mineral Springs to the Trust on either March 15, 2015, or March 15, 2017, as called for by the Agreement. Sometime prior to 2016, Idaho Mineral Springs' corporate status lapsed and Tacke has continued operation of the business as a personal venture.

On January 11, 2017, the Trust filed this action against Tacke, seeking damages for breach of contract in the "principal sum of $500,000 plus the . . . prejudgment interest." Tacke counterclaimed, asserting breach of contract, conversion, tortious interference with Tacke's business and the Agreement, defamation, unjust enrichment, trespass, and trespass to chattels.

The Trust filed a motion for partial summary judgment on February 5, 2018, seeking to recover on its claim that Tacke had defaulted on his loan. Tacke did not file a motion or brief in opposition to the Trust's motion. The district court awarded partial summary judgment to the Trust, observing that, although Tacke wanted to pursue evidence in support of his claims, he had failed "to address or challenge the fact of the loan or non-payment on the loan." The Trust then moved for summary judgment, seeking dismissal of Tacke's counterclaims. Tacke again failed to respond to the motion. Tacke's attorney filed a motion to withdraw due to nonpayment of fees but did not schedule the motion for hearing.

On August 21, 2018, the district court granted the Trust's second motion for partial summary judgment and entered a judgment awarding the Trust "$500,000.00, with interest accruing thereon at the statutory rate." Through counsel, Tacke filed a motion for reconsideration on August 29, 2018. The same day, the Trust filed a motion seeking an order awarding prejudgment interest that had not been addressed in the court's judgment. Approximately two weeks later, the court granted Tacke's attorney's motion to withdraw. Tacke proceeded pro se, and filed a motion seeking continuance of the summary judgment but he did not respond to the Trust's final motion for prejudgment interest. At a hearing on his motion, Tacke argued that the Agreement was a "conditional loan which was only to be a loan if it was repaid." The district court found that Tacke was attempting "to use prior discussions and negotiations to alter the express terms of the written contract." The court explained that because the Agreement was

4

unambiguous, parol evidence could not be used to alter its terms. With no basis to reconsider the order granting summary judgment, the district court denied Tacke's motion.

On January 23, 2019, the district court issued an order awarding the Trust prejudgment interest ($136,027.40), costs ($261), and attorney fees ($17,505). An amended judgment was then entered against Tacke the following day, awarding the Trust $653,793.40.

Now represented by a new attorney, Tacke filed a second motion for reconsideration, asking the court to reconsider all of its prior orders and judgments. Tacke argued that his motion for reconsideration was timely because there was no final judgment until January 24, 2019, when the district court issued its amended judgment. The district court disagreed, explaining that it would only consider Tacke's arguments concerning the January 23, 2019, order regarding prejudgment interest, costs, and attorney fees. The district court held that the motion was untimely as to the original grant of summary judgment because the claims for prejudgment interest, costs and fees were derivative of the final judgment issued in August 2018. The district court denied Tacke's second motion for reconsideration and Tacke timely appealed.

## II.     STANDARD OF REVIEW

Pursuant to Idaho Rule of Civil Procedure 11(a)(2)(B), the district court has no discretion on whether to entertain a motion for reconsideration. *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). Rather, "the court must consider any new admissible evidence or authority bearing on the correctness of an interlocutory order." *Id.* "When deciding the motion for reconsideration, the district court must apply the same standard of review that the court applied when deciding the original order that is being reconsidered." *Id.* We also review the decision on a motion for reconsideration with the same standard of review utilized by the lower court. *Id.* Thus, where

> the district court grants summary judgment and then denies a motion for reconsideration, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment. This means the Court reviews the district court's denial of a motion for reconsideration de novo.

*Idaho First Bank v. Bridges*, 164 Idaho 178, 186–87, 426 P.3d 1278, 1286–87 (2018) (quoting *Massey v. Conagra Foods, Inc.*, 156 Idaho 476, 480, 328 P.3d 456, 460 (2014)).

## III.     ANALYSIS

### A.  Tacke's second motion for reconsideration was timely.

We must first address whether Tacke's second motion for reconsideration was timely as to the district court's grant of partial summary judgment on the Trust's claim for breach of contract and dismissing Tacke's counterclaims, as this issue determines whether we have jurisdiction to consider Tacke's remaining issues on appeal. Tacke argues that his second motion for reconsideration was timely because there was no final judgment until January 24, 2019, when the district court issued its amended judgment to include the prejudgment interest, costs, and attorney fees. Tacke argues that the August 2018 judgment was an interlocutory order that did not adjudicate all claims. The Trust contends that the amended judgment did not alter the finality of the August 2018 judgment, nor did it extend the time for Tacke to appeal. We disagree with the Trust.

Idaho Rule of Civil Procedure 54(a)(1) governs the finality of judgments. It states: "A judgment is final if either it is a partial judgment that has been certified as final pursuant to subsection (b)(1) of this rule or judgment has been entered on all claims for relief, except costs and fees, asserted by or against all parties in the action." I.R.C.P. 54(a)(1). The finality of a judgment is based on an objective standard. *Taylor v. Riley*, 162 Idaho 692, 706, 403 P.3d 636, 650 (2017). This Court has previously held that where an "amended judgment alters content other than the material terms from which a party may appeal, its entry does not serve to enlarge the time for appeal." *Vierstra v. Vierstra*, 153 Idaho 873, 879–80, 292 P.3d 264, 270–71 (2012) (quoting *State v. Ciccone*, 150 Idaho 305, 308, 246 P.3d 958, 961 (2010)). As the Court explained more fully in *Taylor v. Riley*, entry of an amended judgment including incidental awards of attorney fees or costs does not enlarge the time for appeal. Rather, the time for appeal is only extended by entry of an amended judgment addressing a material term of a party's claim for relief. *See* 162 Idaho at 704, 403 P.3d at 648.

In this appeal, we need not address a question of first impression for this Court: Is a claim for prejudgment interest a substantive matter or merely incidental to a recovery for breach of contract? That is because our holding in this case is based upon the unique provisions of the Agreement. Ordinarily, "[i]n order for [prejudgment] interest to be computed from the date of breach of contract, the amount upon which the interest is to be based must have been mathematically and definitely ascertainable." *Barber v. Honorof*, 116 Idaho 767, 770, 780 P.2d 89, 92 (1989). Here, although the amount of interest due the Trust was mathematically and definitely ascertainable, the Agreement specified that Idaho Mineral Springs' quarterly interest

obligation was not to be 1.25% of the $500,000 principal obligation ($6,250), but rather was to be paid "on the combined value of the gold, the silver, and the AUD." Proper resolution of the amount of prejudgment interest Idaho Mineral Springs owed to the Trust requires a presentation of facts which are not within the record, but which are readily ascertainable: the value of the specified quantities of gold, silver and Australian dollars on the dates which Idaho Mineral Springs' interest obligations became due. Thus, as a proper determination of Idaho Mineral Springs' claim for prejudgment interest is dependent upon those values, the unique facts of this case present a situation where the claim for prejudgment interest is substantive. Stated differently, the Trust's claim for prejudgment interest was not simply a procedural or remedial consequence of litigation or matter of mere mathematical calculation; rather, the claim is dependent upon a development of a factual record supporting the Trust's claim for relief. Therefore, until the district court entered a judgment addressing the Trust's claim for prejudgment interest, it had not adjudicated "all claims for relief" until the January 24, 2019, amended judgment and the court erred in holding that the second motion for reconsideration was untimely as to the earlier grants of partial summary judgment.

### B. The Agreement was not a convertible debenture.

As is commonly the case in such appeals, both parties argue that the Agreement is unambiguous while advancing differing interpretations of the contractual terms. James explained his understanding of the Agreement as follows: Firstfruits would pay off Tacke's two mortgages, loan $500,000 to Tacke, and give the Trust an 80% ownership interest in Idaho Mineral Springs by 2023 in the event that Tacke defaulted on the loan. James explained that he wanted the loan repaid in Australian dollars, gold, and silver because he expected the value of the U.S. dollar to decline. Tacke claims that he understood the Agreement to provide that "the Trust's loan would remain an [Idaho Mineral Springs's] debt, but would gradually convert to up to 80% equity in [Idaho Mineral Springs] if the loan was not timely repaid." Tacke asserts he "would not have signed the Agreement" if he understood it to mean he was personally required to repay the debt "even if the Trust gained ownership of [Idaho Mineral Springs]." On appeal, Tacke advances the argument that the Agreement contained a convertible debenture provision that would convert the loan into equity in Idaho Mineral Springs in the event that the loan was not repaid. We agree with the parties that the Agreement is unambiguous but find no merit in Tacke's argument that the Trust's sole remedy is an award of equity in Idaho Mineral Springs.

7

Contract interpretation begins with the instrument's language. *Page v. Pasquali*, 150 Idaho 150, 152, 244 P.3d 1236, 1238 (2010). If clear and unambiguous, the contract's meaning and legal effect are questions of law answered by the plain language. *Id.* However, if a contract is unclear and ambiguous, the instrument's meaning is a question of fact that focuses on the intent of the contracting parties. *Id.* "In determining whether a contract is ambiguous, this Court ascertains whether the contract is reasonably subject to conflicting interpretation." *Id.*

The Agreement's loan terms and provisions regarding equity in Idaho Mineral Springs were laid out as follows:

> The Trust will transfer the U.S.$500,000 to [Idaho Mineral Springs] no later than March 15, 2013, to be secured by 80% of the ownership of [Idaho Mineral Springs].

> [Idaho Mineral Springs] will pay 1.25% interest at the end of each three month period measured from March 15, 2013. Interest will be paid on the combined value of the gold, the silver, and the AUD. If [Idaho Mineral Springs] does not repay the Loan no later than March 15, 2015, then the Loan will remain standing as a debt, and [Idaho Mineral Springs] will transfer to the Trust 20% of ownership in [Idaho Mineral Springs] on March 15, 2015 and 20% ownership on March 15, 2017. As of March 15, 2017, the Trust will own 40% of [Idaho Mineral Springs]. The Trust's ownership will remain at 40% until March 15, 2023 or [Tacke's] passing (whichever comes first), at which time [Idaho Mineral Springs] will transfer an additional 40% to the Trust.

> If [Idaho Mineral Springs] pays the Loan off in full by March 15, 2015, the Trust will not have any ownership in [Idaho Mineral Springs].

Tacke contends that these security provisions meant that the debt converted to equity as a convertible debenture. A debenture is "[a] debt secured only by the debtor's earning power, not by a lien on any specific asset." *Debenture*, Black's Law Dictionary (11th ed. 2019). A convertible debenture occurs where the holder can change or convert the debenture into another form of security, such as stock in a corporate entity. *Id.* Under Tacke's interpretation, the debt owed to the Trust was converted into an 80% ownership interest in Idaho Mineral Springs.

Tacke's argument relies heavily on statements made by James in his deposition that there would be a "convertible debenture," and that the debt would convert to an ownership interest in Idaho Mineral Springs if the debt was not repaid. However, the context of these statements is important. James' testimony on this point related to emails that Tacke's attorney was reviewing prior to the execution of the Agreement; it did not address his understanding of the signed contract. Indeed, at one point James clarified: "You understand this is negotiation. This is – this

8

is not the contract." James testified that it was his intention to become a part-owner of Idaho Mineral Springs "unless [Tacke] paid back the half a million dollars that he borrowed." This, however, is parol evidence that the Court may not consider unless we find the Agreement to be ambiguous. There is no such ambiguity.

The Agreement itself consistently refers to the $500,000 as a "loan," and provides deadlines for interest payments and repayment of the principal sum. Significantly, the Agreement provides that the Trust would receive no equity in Idaho Mineral Springs if the loan was timely repaid: "If [Idaho Mineral Springs] pays the Loan off in full by March 15, 2015, the Trust will not have any ownership in [Idaho Mineral Springs]." More importantly, the Agreement states that Tacke was required to transfer equity in Idaho Mineral Springs if the loan was not timely repaid without eliminating the debt: "If [Idaho Mineral Springs] does not repay the Loan no later than March 15, 2015, *then the Loan will remain standing as a debt, and* [Idaho Mineral Springs] will transfer to the Trust 20% of ownership in [Idaho Mineral Springs] on March 15, 2015 and 20% ownership on March 15, 2017."[1] (emphasis added). Tacke's arguments ignore the crucial use of the conjunction "and," which unambiguously specified both the obligation to repay the loan and the obligation to transfer an ownership interest in Idaho Mineral Springs if the loan was not timely repaid.

### C. The awards of contract damages and prejudgment interest must be vacated because the Trust failed to prove the value of the commodity basket.

Tacke's next argument for overturning the awards for damages and prejudgment interest is that the Trust failed to prove the value of the commodity basket. In opposition to the second motion for reconsideration and again on appeal, the Trust argued that Tacke "mixes the remedies of specific performance and actual damages to tilt the damage award in his favor" while ignoring the fact that he was still required to pay $500,000. We disagree with the Trust's argument.

The Agreement is unambiguous. It provides for a loan of $500,000 to Idaho Mineral Springs, with repayment to be made in specified quantities of Australian dollars, gold, and silver, with the 1.25% quarterly interest payments to be calculated on the value of the commodity basket:

> The Trust will lend U.S.$500,000.00 to [Idaho Mineral Springs] for two years, at 5% interest (the "Loan"). [Idaho Mineral Springs] will repay the Loan in a

---

[1] The Agreement further provided that an additional 40% interest in Idaho Mineral Springs would be transferred to the Trust on March 15, 2023, or the time of Tacke's death, whichever came first.

combination of gold, silver and Australian Dollars ("AUD"), one third each. U.S.$166,666.00 converts into 105.485 ounces of gold at today's rate of U.S.$1580/oz. U.S.$166,666.00 converts into 5,847.93 ounces of silver at U.S.$28.5/oz. of silver and U.S.$166,667.00 converts into 161,500 [Australian dollars] with the $1.032 USD = $1.000 AUD.

The Trust included these terms because James believed the value of the Australian dollar and the precious metals would rise as against the U.S. dollar. If the value of the metals and Australian dollar had appreciated as James expected, Tacke would have been required to convey more than $500,000 in value to the Trust. Of course, this provision also came with the inherent risk that the commodity basket would depreciate as against the U.S. dollar, which is what occurred. In any event, Idaho Mineral Springs did not contract to repay the Trust $500,000. Instead, it agreed to pay the Trust 105.485 ounces of gold, 5,847.93 ounces of silver, and 161,500 Australian dollars by March 15, 2015, and to make quarterly payments of 1.25% of the value of the commodity basket. Because the district court did not apply the terms of the Agreement in making its award of damages for breach of contract, we vacate the district court's judgment of $500,000 and prejudgment interest based upon that principal sum. On remand, the district court must determine the value of the commodities basket at the relevant points in time to calculate the appropriate contract damages and prejudgment interest.

**D. Tacke did not plead a mutual-mistake defense pursuant to Idaho Rule of Civil Procedure 9(b).**

Tacke next argues that this Court should overturn the judgment if it concludes the Agreement required money damages, and permit Tacke to advance a mutual-mistake defense at trial. As with his claim that the Agreement provided for a convertible debenture, Tacke relies heavily on James' deposition testimony to establish a mutual mistake between the parties. As previously noted, James' testimony was made in the context of reviewing emails and negotiations leading up to the Agreement, not his understanding of the Agreement itself. More importantly, we agree with the Trust that that a mutual-mistake defense was not properly pled under the Idaho Rules of Civil Procedure.

Under Idaho Rule of Civil Procedure 9(b), claims of mistake must be pled with particularity, meaning the alleging party must specify the circumstances constituting fraud or mistake. *Brown v. Greenheart*, 157 Idaho 156, 164, 335 P.3d 1, 9 (2014). As with other pleading averments, the adverse party must be put on notice of the claims brought against it. *Id.* Here, Tacke's first reference to a defense of mutual mistake was in connection with his second motion

10

for reconsideration, filed after the district court issued the amended judgment. Not only is a mutual-mistake argument lacking from his pleadings, it is absent from all court documents through the issuance of the judgment and amended judgment. A motion for reconsideration is simply not a basis for advancing a new theory not previously addressed in the pleadings. Therefore, the district court did not err by denying Tacke's motion for reconsideration based upon mutual mistake.

### E. The award of costs and fees is vacated.

Tacke's final argument is that the Trust should no longer be a prevailing party if the damages should be overturned on appeal. Tacke is correct that Idaho Code section 12-120(3) and Idaho Rule of Civil Procedure 54(d)(1) only provide attorney fees and costs to the prevailing party. While we have vacated the judgment for damages and prejudgment interest, the orders granting the Trust partial summary judgment on its claim for breach of contract and dismissing Tacke's counterclaims are not affected and the Trust will remain the prevailing party before the district court. Nevertheless, in light of the proceedings that will be necessary before the district court on remand, we vacate the district court's award of costs and fees.

### F. We do not award either party attorney fees or costs on appeal.

Both parties argue they are entitled to attorney fees under Idaho Code section 12-120(3), which entitles a prevailing party attorney fees in actions concerning contracts and commercial transactions. Because the Agreement was for a loan in developing a water-bottling business, the gravamen of this case is commercial. The Trust also contends that it is entitled to attorney fees under Idaho Code section 12-121, which permits an award of attorney fees where the Court finds "the case was brought, pursued or defended frivolously, unreasonably or without foundation." Tacke has persuaded us that the award of damages and prejudgment interest must be vacated and thus, his appeal was not frivolous. Because both parties have prevailed in part in this appeal, we will not award costs or fees.

## IV.    CONCLUSION

For the foregoing reasons, we vacate the amended judgment of the district court and remand for further proceedings consistent with this opinion.


Chief Justice BURDICK, and Justices BRODY, BEVAN and STEGNER **CONCUR.**

11